IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:  20-2689

GROWGENERATION CORP., a Colorado corporation,
and GROWGENERATION MICHIGAN CORP., a Michigan corporation,

      Plaintiffs,

v.

GRAND RAPIDS HYDROPONICS, INC., a Michigan
corporation, and CHRISTOPHER NICHOLSON, an individual,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiffs GrowGeneration Corp. and GrowGeneration Michigan Corp. (collectively "GrowGen"), by and through their undersigned attorneys, state their Complaint as follows:

### INTRODUCTION

      1.     To induce GrowGen to purchase all the assets of Defendant Grand Rapids Hydroponics ("GRH"), GRH and Christopher Nicholson ("Nicholson," collectively with GRH, "Defendants"), deliberately concealed that Nicholson, who was the primary owner and key operator of GRH, also owned a sister company less than 40 miles away that, after the transaction, would be in direct competition with GRH.  Defendants concealed this fundamental piece of information from GrowGen so that they could benefit from selling the assets of GRH to GrowGen for millions of dollars of value but also compete with GrowGen on the side following the transaction.

2.      In aid of their concealment of the existence of this other business, GRH and Nicholson both entered agreements whereby they promised not to compete with GrowGen once the transaction closed.  But, they ignored those agreements.  After the transaction, Nicholson continued to operate his other business in direct violation of the non-compete agreements.  Had GrowGen any idea that Nicholson had another business that he would continue operating in competition with GrowGen, it would never have entered the transaction or provided Nicholson confidential GrowGen information once Nicholson began to work for GrowGen following the transaction.  As a result of this fraudulent conduct, Nicholson and GRH wrongfully received millions of dollars and a considerable number of shares of stock in GrowGen.  GrowGen brings this action to stop Nicholson from competing and harming GrowGen's business and to recover all the wrongfully obtained consideration that was provided to GRH and Nicholson.

3.      On top of this fraud and wrongful competition, in the lead up to the transaction, GRH and Nicholson provided false financial information that reflected artificially low payroll costs.  GrowGen later came to find out that instead of disclosing the full compensation they provided to their workers, they only disclosed the payroll that they kept "on the books."  The financial information did not reflect that they were compensating a number of the employees "under the table" without a traditional paycheck.  Thus, the financials reflected artificially inflated GRH's profits (and the arrangement likely violated tax laws).  Once GrowGen assumed operations, it discovered the fraud and illegal employment practices and corrected them.  But the result of this fraud was a grossly inflated purchase price for the assets.

4.      To this day, GRH and Nicholson have enjoyed the ill-gotten gains resulting from their fraud and competition.  GRH and Nicholson need to remedy the damages they have caused

and to cease further damages resulting from Nicholson's wrongful competition.  This Complaint is the first step in that process.

## PARTIES

5.      Plaintiff GrowGeneration Corp. is a Colorado corporation and a retailer of hydroponic equipment and supplies with its principal place of business in Denver, Colorado.

6.      Plaintiff GrowGeneration Michigan Corp. is a subsidiary of GrowGeneration Corp. and a Delaware corporation.  GrowGeneration Michigan Corp's headquarters are located in Denver, Colorado.

7.      Upon information and belief, Defendant Grand Rapids Hydroponics, Inc. ("Grand Rapids Hydroponics" or "GRH") is a Michigan corporation which operated a specialty hydroponic equipment and supply retail store with its principal place of business in Grand Rapids, Michigan.

8.      Upon information and belief, Defendant Christopher Nicholson ("Nicholson") is an individual who resides in Grand Rapids, Michigan.

## JURISDICTION AND VENUE

9.      Jurisdiction is proper in this Court pursuant to 28 U.S.C § 1332(a) because the parties are of different states and the amount in controversy exceeds $75,000.

10.      Venue in this District is appropriate because Executive Employment Agreement, which set forth terms for Nicholson's employment with GrowGeneration Michigan Corp. and includes non-compete provisions, contains a choice of venue clause designating Colorado as the exclusive location for a dispute relating to the Executive Employment Agreement, Exhibit 2 at § 2.g.i.

11.    Additionally, venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2), because GRH and Nicholson made numerous fraudulent statements to GrowGen in Colorado, both provided false financial information to GrowGen in Colorado, the Asset Purchase Agreement and Executive Employment Agreement, which are at issue in this case, contain Colorado choice of law clauses and were negotiated in Colorado, and a Colorado corporation's shares constitute a substantial part of the property that is the subject of this dispute.

## GENERAL ALLEGATIONS

### A.  GrowGen's Expansion into Michigan

12.    Since its founding in 2014, GrowGen has become the largest hydroponic equipment supplier in the country with 28 locations in 10 states and a robust online presence. GrowGen's growth has been driven both by opening new stores and by acquiring existing stores in new markets. GrowGeneration Michigan Corp. is a subsidiary of GrowGeneration Corp. formed to facilitate GrowGen's expansion into Michigan.

13.    As part of its ongoing expansion into Michigan, GrowGen began discussions with GRH and Nicholson about acquiring GRH on or about November 25, 2018.  GrowGen had previously acquired three stores in Michigan.  The discussions continued until the deal closed in September, 2019.

14.    Prior to the transaction, GRH was a large, successful hydroponics store with a robust customer base in western Michigan and an online sales presence.  GrowGen was interested in adding a store that had attracted such a large customer base to its collection of first-in-class hydroponic stores around the country.  It was also interested in the opportunity to bring

4

Nicholson on as a member of the GrowGen team.  Nicholson was known to have a strong relationship with hydroponic product consumers in western Michigan and elsewhere.

15.     During the lead up to the transaction, Nicholson and GRH provided financial information showing that GRH was quite profitable.  As with any purchase and sale of a business, the financial data provided by GRH played a pivotal role in the transaction.

16.     Nicholson also represented that there was no meaningful competition for GRH in the relevant area.

17.     Hydroponic retail is a highly specialized business built primarily on personal relationships between retailer and clientele. Given the nature of the business, it was very important for Nicholson not to compete with GrowGen following the transaction.

18.     Because of the personal nature of the business and relationships with the customers, if Nicholson were to compete with GrowGen after GrowGen's acquisition of GRH's assets, the purchase would be of significantly diminished value, if any, because such a scenario would risk the loss of a significant portion of GRH's customers and thus revenue.  The value of the transaction was in large part dependent on bringing the customers that GRH and Nicholson had developed into the GrowGen family.

19.     Nicholson and GRH knew that GrowGen was counting on their expertise and knowledge of the western Michigan hydroponics market and that maintaining the existing customer base was a primary objective for GrowGen in structuring the deal.

   **B.  GrowGen's Acquisition of GRH**

20.     GrowGen acquired GRH through an Asset Purchase Agreement ("APA") dated August 4, 2019 (although the transaction did not formally close for another month). The APA is

attached hereto as **Exhibit 1**.  GrowGen purchased GRH and all of its assets, including its goodwill, inventories, fixed assets and tangible personal property, intangible property, and contracts.

21.     Under the APA, the intangible assets GRH transferred to GrowGen included GRH's "customer lists, customer files, and customer records."  APA § 2.1.3.

22.     In addition to transferring all of GRH's assets to GrowGen, GRH and GrowGen agreed that GRH's founder and president, Christopher Nicholson, would join GrowGen as the Vice President of Online Sales and Business Development to keep a connection with the customer base.  Pursuant to his Executive Employment Agreement ("the Employment Agreement"), attached hereto as **Exhibit 2**, Mr. Nicholson would devote substantially all of his business efforts to GrowGen and agreed not to compete with GrowGen while employed or for a period of time thereafter.

23.     As an express condition of the APA, GRH and Nicholson additionally agreed not to compete with GrowGen through a Non-Competition and Confidentiality Agreement ("the Non-Competition Agreement"), attached hereto as **Exhibit 3**. The principal of non-competition was so fundamental to the deal that Nicholson was required to sign two non-competition agreements.

24.     The terms of the Non-Competition Agreement are broad and expressly prohibit GRH and Nicholson from owning, managing, or controlling "a business that consists primarily of the Retail Sale of hydroponic gardening products, they being indoor plant grow lights and propagation and irrigation supplies in the continental United States" for a period of three years. *Id*. at §§ 1.3, 1.4.  The parties acknowledged "the highly competitive nature of the business" and

that "it would be unfair" for Nicholson to violate the terms of the agreement to the detriment of GrowGen. *Id.*, Recital B.  The Non-Competition Agreement was signed by Nicholson, as then-President of GRH.  *Id.* at 3.

25.     The Employment Agreement provides that Nicholson shall have the responsibility of overseeing the GrowGen's "Store/Sales activities" in Grand Rapids and "will be responsible for the overall management of the [GrowGen] Stores located in the Grand Rapids area and to grow its sales."  Employment Agreement § 1.b.  The agreement lists the following specific responsibilities, among others: "[d]eliver excellent customer service and demonstrate a high degree of professionalism"; "[a]chieve high levels of sales performance results"; "[r]eview operational reports as well as records to make sure adherence to Company policies and procedures"; "[p]romote the Company to existing and new customers and other businesses"; and "[o]versee compliance of sales associates, sales lead as well as assistant store manager with established Company policies plus standards, like safekeeping of Company funds and property, personnel practices, security, sales, record keeping procedures and overall maintenance of the store." *Id.*  It further states that Nicholson shall devote "substantially all his business time, labor, skill and energy to conducting the business and affairs of the Company and performing his duties and responsibilities to the Company."  Employment Agreement § 1.c.

26.     The Employment Agreement also noted that Mr. Nicholson would receive GrowGen confidential information as part of his employment, and that he had a duty to keep that information confidential.  Employment Agreement § 2.e.i-iii.  In addition to Nicholson's agreement restrictive covenant in the Non-Compete Agreement, as part of his Employment Agreement, he also agreed not to:

> [D]irectly or indirectly[] manage, operate or control, participate in the ownership, management, operation or control of, or otherwise become interested in (whether as an owner, stockholder, member, partner, lender, consultant., executive officer, director, agent, supplier, distributor or otherwise) any business which is competitive with the business of the Company or any of its subsidiaries or affiliates, or, directly or indirectly, induce or influence any person that has a business relationship with the Company or any of itis subsidiaries or affiliates to discontinue or reduce the extent of such relationship.

Employment Agreement § 2.e.iv.

27.     In return, GrowGen paid Nicholson $1,300,000 for GRH's inventory, $50,000 for the fixed assets, $1,000,000 for its intangible assets and goodwill, and issued 300,000 restricted GrowGen common shares. **Exh. 1**, APA § 2.2, although it held a certain amount of the cash components back in escrow.  The escrow was required because GRH had delinquent tax liabilities and its accountants were working with the IRS on the back taxes for 2017 and 2018 based on the updated financials provided as part of the transaction.  GrowGen insisted that the escrow be maintained until the back taxes were paid.  That ultimately occurred several months after the closing of the transaction.

28.     The 300,000 restricted GrowGen common shares are due to become unrestricted on Thursday, September 3, 2020.  GRH has indicated that it intends to transfer those shares on September 4.

**C.  <u>After the Transaction Closed, the Truth about Nicholson and GrowGen Became Clear</u>**

29.     Nicholson's employment with GrowGen was a disaster.  From the beginning of his employment with GrowGen, Nicholson abused his position with GrowGen and acted in bad faith.  In violation of the Employment Agreement, he bad-mouthed GrowGen to customers and potential customers.  He declared that he was only going to stay with GrowGen until he could

sell his GrowGen stock.  In addition, Nicholson routinely drank on the job and was abusive to

employees.  Nicholson publically expressed his desire to "sink" GrowGen and put it out of

business, and to compete with GrowGen as soon as he was able to do so.

      30.     On one occasion, on April 27, 2020, Nicholson induced a customer to yell at and

harass Jim Smith, GrowGen's Vice President of Retail Operations.

      31.     Shortly thereafter, while speaking to Mr. Smith, Nicholson threatened the Grand

Rapids location and explained that he would lease his real property to GrowGen's competitors.

He expressed in vulgar terms a desire to harm GrowGen and threatened to harm Mr. Smith

personally.  This occurred publically in the view of other staff members.

      32.     In light of Nicholson's conduct with respect to his treatment of employees

connected with the Grand Rapids facility, GrowGen requested that Nicholson attend anger

management coaching, to which Nicholson agreed.  Upon information and belief, Nicholson

stopped attending after approximately a month.

      33.     Nicholson took active steps to disrupt and impede GrowGen's ongoing business

in violation of his Employment Agreement.  He routinely encouraged employees to leave work,

told them that GrowGen was taking advantage of them, and encouraged them to consume

alcohol during business hours.  Upon information and belief, in violation of the very company

policies that it was Nicholson's duty to uphold and enforce, Nicholson had an interest in or was

facilitating cannabis cultivation (*i.e.* grows) in Michigan.  It is unclear whether these were

licensed or unlicensed operations.

      34.     Even worse, Nicholson took active measures to impede GrowGen's business.

Nicholson encouraged customers and employees not to use GrowGen's customer database.

Instead, Nicholson directed customers to provide their contact information to him personally for storage on his cell phone.  This was directly contrary to GrowGen's business policies.

35.     GrowGen confronted Nicholson repeatedly about his conduct and provided him with opportunities to correct his behavior so as to comply with his contractual obligations and fiduciary duties as a GrowGen employee.  But Nicholson was unrepentant and obstinate. GrowGen terminated his employment on July 28, 2020.

36.     GRH's customer list constituted a customer list, file, or record under the APA and as such was GrowGen's property.  Indeed, customer contact information was a significant portion of the intangible assets and goodwill of GRH, for which GrowGen paid $1,000,000.

37.     Nevertheless, Nicholson took his cell phone and GRH/GrowGen's customer list with him when he departed from GrowGen.

38.     Beyond the problems with Nicholson as an employee, GrowGen discovered that the financial documents and employee information Nicholson and GRH provided to GrowGen in advance of the transaction were false.  Nicholson had paid several employees "off the books."  In addition to being illegal, this wrongful behavior created an artificially profitable picture of GRH by allowing Nicholson to portray as profits income he extracted from the business when, in fact, it was needed to pay vital employees.  Upon information and belief, GRH did not withhold taxes on those employees and pay the employer's share of taxes to the federal government.

39.     By way of example, when GrowGen sought to bring its employee compensation policies up to speed and begin normal payroll operations, Rusty Golemba, GRH's key salesman, left the company rather than fill out payroll forms.  Nicholson encouraged Golemba to leave the company rather than join its payroll.  The loss of GrowGen's key employee right out of the gate

was a significant economic harm and a direct consequence of GRH's wrongful employment

practices that were concealed from GrowGen.

**D. GrowGen Discovers Nicholson Has Been Competing And Defrauded GrowGen During the Transaction**

40.     In addition to fraudulent financial statements, GrowGen eventually discovered

that Nicholson and GRH's representations about the absence of nearby competition were false.

In fact, Nicholson owns a competing business, G.R. Hydro North.  G.R. Hydro North, like

GRH, is a retailer of hydroponic gardening products.  It is located about 35 miles away from

GRH in Newaygo, Michigan.  As evidenced by its Facebook account, the company has been

operating a hydroponic gardening products retail business since at least 2017.

41.     GRH was previously known informally as "GR Hydro," and the name G.R.

Hydro North is meant to associate G.R. Hydro North with GRH.

42.     GrowGen learned of Nicholson's side competition approximately seven months

into Nicholson's employment with GrowGen, and confronted Nicholson about it.  He

acknowledged that he owned G.R. Hydro North, but falsely claimed that GrowGen had been

aware of its existence, that he would cease involvement with G.R. Hydro North, and that G.R.

Hydro North was not harming GrowGen.  Thereafter, GrowGen continued to monitor the

situation and confirm Nicholson's involvement and whether harm was being caused.

43.     That harm has now been confirmed.  GrowGen's other stores have been wildly

successful over the past year, with stores it has owned for more than a year up 47% over this

quarter one year ago.  GrowGen's three other Michigan stores' profits are up 112%.  At the same

time, the store GrowGen purchased from GRH and Nicholson has ranged between holding

steady and declining in sales.  This poor performance is caused by the competition from G.R.

Hydro North and from Nicholson's on-going competitive measures to harm and badmouth GrowGen. These losses have cost GrowGen millions.

44.     Moreover, after Nicholson agreed to not have any association with the competing store, GrowGen discovered that Nicholson sold tens of thousands of dollars worth of GrowGen products to G.R. Hydro North at a price that was not only well below vendor wholesale, but below GrowGen's actual cost. In other words, Nicholson funneled GrowGen products to his competing business at a loss to GrowGen.

45.     Upon information and belief, Nicholson also used GrowGen's agreements with suppliers to purchase materials for G.R. Hydro North at GrowGen's discounted rate, improving G.R. Hydro North's competitive position vis-à-vis GrowGen.

46.     If all of this were not enough, GrowGen recently learned that Nicholson is attempting to open a large store in Oklahoma, approximately thirty miles from GrowGen stores in that state. This new business will compete with, and cause significant harm to, GrowGen's operations in Oklahoma.

47.     As a result of his competition, GrowGen's reputation has suffered through Nicholson's badmouthing GrowGen to customers and otherwise behaving inappropriately. Nicholson's apparent goal in working to undermine GrowGen's position with its customers, potential customers, and employees was in furtherance of his plan to, directly and through intermediaries "sink" GrowGen.

48.     Nicholson repeatedly threatened to harm GrowGen during his employment and, with his competing store, clearly has the ability to bring his threats to fruition. Nicholson threatened to harm GrowGen's continuing operations to GrowGen employees, to drive it out of

business, and to take other actions to negatively impact GrowGen.  As set forth above, when he departed, Nicholson took with him a personal cell phone containing the contact information of all of GrowGen's significant customers from western Michigan.  This contact information belonged to GRH, and in diverting it, Nicholson effectively seized access to the business contacts and goodwill for which GrowGen paid millions.  GrowGen's sales are down 27% in the month since Nicholson's departure and down 43% since June 2020, suggesting that he has likely continued and accelerated his practice of competing through bad-mouthing GrowGen to customers and potential customers, directing them away from GrowGen.

49.     In addition, Nicholson has the ability to harm GrowGen's online business using the information he acquired as GrowGen's VP of Online Sales.  GrowGen has significant online sales, including through Amazon.  Among other harms, Nicholson's G.R. Hydro North boasts that it can offer prices "better than Amazon."

## COUNT I
### (Breach of Employment Agreement – Christopher Nicholson)

50.     GrowGen re-alleges and incorporates by reference Paragraphs 1 through 47 of this Complaint.

51.     GrowGen and Nicholson entered into an Employment Agreement on September 3, 2019.

52.     GrowGen substantially performed its obligations under the Employment Agreement, including compensating Nicholson for employment commencing on that day.

53.     Pursuant to Section 1.c of the Employment Agreement, Nicholson agreed to devote "substantially all his business time, labor, skill and energy to conducting the business and affairs of the Company and performing his duties and responsibilities to the Company."

13

54.     Pursuant to Section 2.e.iv of the Employment Agreement, during the term of Nicholson's employment and for a period of one (1) year thereafter, Nicholson agreed not to:

> [D]irectly or indirectly[] manage, operate or control, participate in the ownership, management, operation or control of, or otherwise become interested in (whether as an owner, stockholder, member, partner, lender, consultant., executive officer, director, agent, supplier, distributor or otherwise) any business which is competitive with the business of the Company or any of its subsidiaries or affiliates, or, directly or indirectly, induce or influence any person that has a business relationship with the Company or any of itis subsidiaries or affiliates to discontinue or reduce the extent of such relationship.

Employment Agreement § 2.e.iv.

55.     Nicholson breached the Employment Agreement by owning, managing, operating and/or controlling G.R. Hydro North, a competing hydroponic gardening business located less 40 miles up the road from GrowGen's Grand Rapids operation and otherwise not devoting his time to GrowGen, but rather to harming GrowGen to benefit G.R. Hydro North.

56.     G.R. Hydro North, like GrowGen, sells hydroponic gardening products.  It directly competes with GrowGen in the same geographic market.  After entering into the Employment Agreement in 2019, Nicholson did not cease operating G.R. Hydro North. Instead, he repeatedly breached the Employment Agreement by continuing to operate G.R. Hydro North and using his position at GrowGen to further G.R. Hydro North's interests.

57.     Nicholson's breach of this agreement harmed GrowGen.  GrowGen lost business opportunities as a result of competition from G.R. Hydro North.  Hydroponic retail is built primarily on personal relationships, so Nicholson's competition with GrowGen after agreeing to work exclusively for GrowGen is particularly harmful.  Moreover, Nicholson provided products to his competing store at a discount or otherwise used GrowGen information to obtain competitive advantages for G.R. Hydro North.

14

58.     Upon information and belief, Nicholson is currently opening a new hydroponic gardening supply store which will compete with GrowGen in Oklahoma, in further breach of his agreement not to compete.

59.     Nicholson has repeatedly disrupted GrowGen's relationships with its employees, including by harassing Jim Smith, by inducing Rusty Golemba not to become a GrowGen employee, and by inducing employees to consume alcohol in the midst of their work shifts.  All of this violates the Employment Agreement.

60.     Nicholson's ongoing breaches of the Employment Agreement is also causing irreparable harm, by among other things directing customers away from GrowGen, thereby impacting GrowGen's goodwill and competitive position in the marketplace.  Accordingly, GrowGen seeks a preliminary and permanent injunction to prevent such harm.

61.     Pursuant to § 2.e.vi, the parties to the agreement acknowledged the irreparable nature of the harm caused by a breach and agreed that in the event of a breach, GrowGen would be entitled to a temporary and preliminary injunction enjoining such breach (without the necessity of posting a bond).

62.     GrowGen further demands monetary damages in an amount to be proven at trial, including amounts paid to Nicholson and the harm caused and losses to the GrowGen business.

## COUNT II
### (Breach of Non-Competition Confidentiality Agreement – Christopher Nicholson)

63.     GrowGen re-alleges and incorporates by reference Paragraphs 1 through 47 of this Complaint.

64.     GrowGen and Nicholson entered into a Non-Competition Agreement on September 3, 2019 as part of the sale of the assets of Grand Rapids Hydroponics to GrowGen.

65.     GrowGen substantially performed its obligations under the Non-Competition Agreement by consummating the Asset Purchase Agreement.

66.     Pursuant to Section 1.3 of the Non-Competition Agreement, for the three (3) year period following the execution of the Non-Competition Agreement, Nicholson agreed not to "own, manage, or control" a business engaged in the retail sale of hydroponic gardening materials in the continental United States. Non-Competition Agreement §§ 1.2-4.

67.     Nicholson breached the Non-Competition Agreement by owning, managing, operating and/or controlling G.R. Hydro North, a competing hydroponic gardening business located less 40 miles up the road from GrowGen's Grand Rapids operation.

68.     G.R. Hydro North, like GrowGen, sells hydroponic gardening products.  It directly competes with GrowGen in the same geographical market.  After entering into the Non-Competition Agreement in 2019, Nicholson did not cease operating G.R. Hydro North.  Instead, he repeatedly breached the Non-Competition Agreement by continuing to operate G.R. Hydro North and using his position at GrowGen to further G.R. Hydro North's interests.

69.     Nicholson's breach of the Non-Competition Agreement harmed GrowGen. GrowGen lost business opportunities as a result of competition from G.R. Hydro North. Hydroponic retail is built primarily on personal relationships, so Nicholson's competition with GrowGen after agreeing to work exclusively for GrowGen is particularly harmful.  Moreover, Nicholson provided products to his competing store at a discount or otherwise used GrowGen information about pricing to obtain competitive advantages for G.R. Hydro North.

70.     Upon information and belief, Nicholson is currently opening a new hydroponic gardening supply store which will compete with GrowGen in Oklahoma.

71.     Nicholson has retained the customer list for GrowGen's Grand Rapids location, which belongs to GrowGen and contains its customer information, and which he may use to harm and compete with GrowGen.

72.     Nicholson's ongoing breach of this agreement is also causing irreparable harm, but among other things directing customers away from GrowGen, thereby impacting GrowGen's goodwill and competitive position in the marketplace.  Accordingly, GrowGen seeks a preliminary and permanent injunction to prevent such harm.

73.     GrowGen further demands monetary damages in an amount to be proven at trial.

**COUNT III**
**(Breach of Asset Purchase Agreement against GRH)**

74.     GrowGen re-alleges and incorporates by reference Paragraphs 1 through 47 of this Complaint.

75.     GrowGen and GRH entered into the APA on August 4, 2019.

76.     GrowGen substantially performed it obligations under the APA.

77.     Under the APA, GrowGen purchased the intangible assets of GRH, including "customer lists, customer files, and customer records."  APA § 2.1.3.

78.     GRH stored this data on Nicholson's cell phone.

79.     Upon the execution of the APA, the customer lists, customer files, and customer records on Mr. Nicholson's phone became the property of GrowGen.

80.     The APA required GRH to "take such steps as are necessary to put [GrowGen] in actual possession and control" of the customer lists, customer files, and customer records.

81.     Rather than turn this property over to GrowGen, GRH has improperly retained it.

82.     In doing so, GRH has breached the APA.

17

83.     GrowGen has been damaged by Nicholson's breach of the APA and his failure to turn over the customer lists, customer files, and customer records in his possession.

84.     GrowGen requests an order directing Mr. Nicholson to turn this data over to GrowGen, and for damages in an amount to be proven at trial.

### COUNT IV
### (Fraud Against Nicholson and Grand Rapids Hydroponics)

85.     GrowGen re-alleges and incorporates by reference Paragraphs 1 through 47 of this Complaint.

86.     GrowGen, Nicholson, and GRH entered into the APA on August 4, 2019.  Prior to entering that agreement whereby GrowGen purchased all the assets of GRH, GrowGen was provided information concerning GRH and its owner, Christopher Nicholson, to understand the business and understand the competitive landscape in the region.

87.     Nicholson and GRH emphasized that GRH had no competitors in the region. Never, did Nicholson or GRH disclose that Nicholson was a principal in a sister business less than 40 miles away, G.R. Hydro North.

88.     In addition, Nicholson and GRH provided false financial information by failing to identify under-the-table payments Nicholson made to key employees for their work at GRH. By failing to disclose these expenses, Nicholson made GRH appear significantly more profitable than it actually was.

89.     Nicholson's connection solely with one hydroponics business in the area was a key inducement to the transaction.  In fact, to ensure that Nicholson was not going to engage in a competitive business in the future, GRH, and Nicholson personally, were required to agree to a three-year non-compete as a condition of the transaction.  As set forth above, the personal

relationship between the founder/leader of a hydroponics store and the general community is often key to such a store's success.

90.     Had GrowGen any idea that Nicholson was associated with another store in close proximity to the store that was the subject of the transaction, it would not have entered the APA.

91.     GRH and Nicholson had a duty to disclose that Nicholson was a principal in a competing business in close proximity to the store that was the subject of the transaction.

92.     GRH and Nicholson intended that GrowGen rely upon its mistaken belief that the only store that Nicholson was affiliated with was the one that was the subject of the APA.

93.     GrowGen reasonably relied upon the mistaken belief caused by GRH and Nicholson and entered the APA.  GrowGen had no reason to suspect Nicholson's affiliation with G.R. Hydro North, or that GRH would use Nicholson's position with GrowGen to further G.R. Hydro North's competitive interests.

94.     If GRH and Nicholson had not concealed the relationship with and otherwise misled GrowGen about G.R. Hydro North, GrowGen would not have entered into the APA. Therefore, GrowGen was damaged by the concealment when it entered the APA, issued 300,000 restricted GrowGen common shares, and paid $1,300,000 for GRH's inventory, $50,000 for fixed assets, $1,000,000 for intangible assets and goodwill.

95.     GRH and Nicholson had a duty to disclose accurate financial information.

96.     GRH and Nicholson intended that GrowGen rely upon the financial information provided.

97.     GrowGen reasonably relied upon that financial information in determining the price for GRH's assets and otherwise entering the transaction.

98.     GrowGen therefore requests that the Court rescind the APA as a result of the foregoing fraud and award GrowGen the damages incurred as a result of the fraud.

99.     In the alternative, if rescission is not available, GrowGen seeks all damages caused by the fraud, including the unjust enrichment received.

## COUNT V
## (Breach of Fiduciary Duty – Against Chris Nicholson)

100.    GrowGen re-alleges and incorporates by reference Paragraphs 1 through 47 of this Complaint.

101.    As the Vice President of Online Sales and Business Development of GrowGen, Nicholson is an agent of GrowGen and owes a fiduciary duty to GrowGen with respect to his obligation to be loyal to GrowGen and only perform services on behalf of GrowGen.

102.    Rather than fulfill his fiduciary duties, Nicholson engaged in a pattern of self-dealing, causing significant damages to GrowGen. Among other things, Nicholson:

a.     Competed with GrowGen and directed his business efforts towards the success of G.R. Hydro North rather than GrowGen.

b.     Sold tens of thousands of dollars worth of inventory to G.R. Hydro North and, upon information and belief, facilitated the sales of inventory to others all at prices below-cost and at a loss to GrowGen;

c.     Disparaged GrowGen to customers and potential customers to discourage them from patronizing GrowGen;

d.     Expressed a repeated desire to harm GrowGen by competing with GrowGen and by renting buildings he owned to others who would compete with GrowGen;

e.     Threatened GrowGen employees and created a hostile work environment;

f.     Made defamatory statements concerning GrowGen to employees, in an effort to induce them to leave GrowGen; and

g.     Impeded the entry of customer information into GrowGen's customer database and instead directed customers to provide their information to him personally so that GrowGen would not be able to maintain an accurate customer database.

103.     GrowGen was damaged by Nicholson's breach of his fiduciary duties.  GrowGen lost valuable business opportunities and the benefit of Nicholson's labor.  In addition, GrowGen suffered reputational harm as a result of the negative statements Nicholson made concerning GrowGen to GrowGen's customers, and GrowGen's potential customers.  GrowGen paid Nicholson wages for his loyalty that should not have been paid.

104.     GrowGen was damaged by all of the foregoing by the loss of business in general and to G.R. Hydro North.

### COUNT VI
### (Civil Theft – Against Chris Nicholson)

105.     GrowGen re-alleges and incorporates by reference Paragraphs 1 through 47 of this Complaint.

106.     Nicholson sold tens of thousands of dollars worth of products in GrowGen's inventory to his competing store, G.R. Hydro North at below-cost prices (at a loss to GrowGen), and upon information and belief, facilitated sales to others at below-cost prices.

107.     Nicholson also facilitated the sales of product "on credit" where he understood that the customers would not pay for the product when the credit became due.

108.     In doing the foregoing, Nicholson knowingly exercised control over and took property belonging to GrowGen.

109.     Nicholson knew the result of his action would be to permanently deprive GrowGen of the money it would have earned if this property had been sold at its standard prices or not sold on credit.

110.     GrowGen was damaged as a result of Nicholson's theft in the amount of the lost income from the sales "on credit" as well as the difference between the price at which it

customarily sells its products and the price at which Nicholson allowed the products to leave the store.

111.    Because Nicholson obtained property belonging to GrowGen by theft, GrowGen is entitled to three times the amount of the actual damages it sustained and is entitled to recover its reasonable attorney's fees.

### COUNT VII
### (Unjust Enrichment – Against Chris Nicholson)

112.    GrowGen re-alleges and incorporates by reference Paragraphs 1 through 111 of this Complaint.

113.    Nicholson obtained economic benefit from the transaction based on fraud, by selling products from GrowGen's inventory to G.R. Hydro North at below-cost prices, through concealing the existence of his competing hydroponic gardening supply business, through competing with GrowGen, and through using the name of the company purchased by GrowGen through the APA to sell products through G.R. Hydro North.

114.    These benefits were at GrowGen's expense.

115.    It would be unjust for Nicholson to retain this benefit without compensating GrowGen.

116.    GrowGen requests that the Court order Nicholson compensate GrowGen for the benefits he wrongfully obtained from it.

### **PRAYER FOR RELIEF**

WHEREFORE, GrowGen respectfully requests that this Court enter judgment in its favor granting the following relief:

A.      For a preliminary and permanent injunction preventing Nicholson and all those working in conjunction with him from competing with GrowGen through G.R. Hydro North or any other entity;

B.      For a preliminary injunction preventing GRH from selling or otherwise disposing of any of the GrowGen shares received pursuant to the APA;

C.      For an order directing Nicholson to turn over the customer lists, customer files, and customer records stored on his personal cell phone to GrowGen;

D.      For the rescission of the APA and the return of the stock and amounts paid to Grand Rapids Hydroponics and Nicholson in connection with it;

E.      In the alternative, if rescission is not available, for all damages caused by the fraud, including restitution of the unjust enrichment received;

F.      For compensatory damages, for Nicholson and GRH's fraud, for Nicholson's breach of is fiduciary duty, and for Nicholson's breach of contract;

G.      For compensatory damages, treble damages, and attorney's fees for the amounts Nicholson stole from GrowGen by selling inventory or facilitating the sale of inventory at below cost;

H.      For prejudgment interest on all amounts claimed to the extent permitted by law;

I.      For reimbursement of GrowGen's fees and costs, including attorney's fees, and

J.      Such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

GrowGen hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 3rd day of September, 2020

DORSEY & WHITNEY LLP

_s/ Gregory S. Tamkin_
Gregory S. Tamkin
Stephen R. Weingold
1400 Wewatta Street, Suite 400
Denver, CO 80202-5549
Telephone: (303) 629-3400
Facsimile: (303) 629-3450
E-mail: tamkin.greg@dorsey.com
          weingold.stephen@dorsey.com

Clint Conner
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868
E-mail: conner.clint@dorsey.com

**Attorneys for Plaintiffs GrowGeneration Corp.
and GrowGeneration Michigan Corp.**

Addresses of Plaintiffs:
GrowGeneration Corp.
1000 W Mississippi Ave.
Denver, CO 80223

GrowGeneration Michigan Corp.
1000 W Mississippi Ave.
Denver, CO 80223